**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re the Application of the Fund for Protection of Investor Rights in Foreign States pursuant to 28 U.S.C. § 1782 for an Order Granting Leave to Obtain Discovery for Use in a Foreign Proceeding | Case No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION PURSUANT TO 28 U.S.C. §1782 FOR AN ORDER GRANTING LEAVE TO OBTAIN <u>DISCOVERY FOR USE IN A FOREIGN PROCEEEDING</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................. 4

A. THE RELEVANT ENTITIES ................................................................................ 4

B. THE DISPUTE ........................................................................................................ 5

1. Lithuania Expropriated Mr. Antonov’s Shares In Snoras. ............................5

2. Lithuania Committed Multiple Treaty Breaches When It Expropriated Mr. Antonov’s Investment In Snoras. .........................................................7

THE SCOPE OF DISCOVERY SOUGHT .................................................................... 9

THE APPLICATION SATISFIES THE THREE STATUTORY REQUIREMENTS OF DISCOVERY PURSUANT TO SECTION 1782 ................................................................ 10

A. THE APPLICATION SEEKS DISCOVERY FROM PERSONS WHO ARE FOUND OR RESIDE WITHIN THIS JUDICIAL DISTRICT. .................. 10

B. THE DISCOVERY IS FOR USE IN A PROCEEDING BEFORE A FOREIGN TRIBUNAL. ........................................................................... 11

C. THE APPLICATION IS MADE BY AN INTERESTED PERSON ................... 12

THE DISCRETIONARY *INTEL* FACTORS FAVOR THE APPLICATION ............................ 12

A. DISCOVERY IS SOUGHT FROM NON-PARTIES. ........................................ 13

B. THE ARBITRAL TRIBUNAL WILL BE RECEPTIVE TO THIS COURT’S ASSISTANCE ........................................................................... 13

C. THIS APPLICATION DOES NOT CIRCUMVENT DISCOVERY LIMITS ............................................................................................................. 14

D. THE REQUESTED DISCOVERY WILL NOT IMPOSE AN UNDUE BURDEN ............................................................................................................ 15

CONCLUSION................................................................................................................ 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Brandi-Dohrn v. IKV Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) ................................................................................................10, 14

*In re Application of Accent Delight Int'l, Ltd.*,
   No. 16-MC-125 (JMF), 2018 U.S. Dist. LEXIS 97673 (S.D.N.Y. June 11,
   2018) ........................................................................................................................................15

*In re Application of Chevron Corp.*,
   709 F. Supp. 2d 283 (S.D.N.Y. 2010) ........................................................................11, 12, 15

*In re Application of Euromepa S.A.*,
   51 F.3d 1095 (2d Cir. 1995) ..............................................................................................13, 14

*In re Chevron Corp.*,
   633 F.3d 153 (3d Cir. 2011) .....................................................................................................12

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002) .....................................................................................................11

*In re Esses*,
   191 F.3d 873 (2d Cir. 1996) .....................................................................................................12

*In re Gemeinschaftspraxis Dr. Med. Schottdorf*,
   No. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Jan. 4, 2007) ......................14, 16

*In re Microsoft Corp.*,
   428 F. Supp. 2d 188 (S.D.N.Y. 2006) ......................................................................................15

*In re O'Keeffe*,
   650 Fed. App'x. 83 (2d Cir. 2016) ...........................................................................................14

*In re Oxus Gold PLC*,
   No. 06-82 GEB, 2007 U.S. Dist. LEXIS 24061 (D.N.J. April 2, 2007) ............................11, 15

*In re Veiga*,
   746 F. Supp. 2d 8 (D.D.C. 2010) .............................................................................................12

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) .........................................................................3, 10, 12, 13, 14, 15, 16

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) .....................................................................................................15

*Republic of Ecuador v. Bjorkman*,
   801 F. Supp. 2d 1121 (D. Colo. 2011) .................................................................................12

**S**TATUTES

28 U.S.C. § 1782(a)  ..................................................................1, 3, 9, 10, 11, 12, 13, 14, 15, 16

**R**ULES

Fed. R. Civ. Proc. 30(b)(6) ............................................................................................................10

The Fund for Protection of Investor Rights in Foreign States (*the Fund* or *the Applicant*) respectfully submits this memorandum of law in support of its *ex parte* application (*the Application*) pursuant to 28 U.S.C. § 1782(a) (*Section 1782*) for an Order Granting Leave to Obtain Discovery for Use in a Foreign Proceeding.

## PRELIMINARY STATEMENT

This Application is made in connection with a pending arbitration (*the Arbitration*), pursuant to the Lithuania-Russia Bilateral Investment Treaty of 2004 (*the Treaty*) and governed by the United Nations Commission on International Trade Law Arbitration Rules (*UNCITRAL Arbitration Rules*). Applicant is a Russian corporation and the assignee of claims brought by Mr. Vladimir Antonov (*Mr. Antonov*) under the Treaty against the Republic of Lithuania (*Lithuania*) in connection with Lithuania's unlawful expropriation of Mr. Antonov's controlling shareholding in AB Bankas Snoras (*Snoras*), once one of Lithuania's leading financial institutions.

Applicant seeks an Order pursuant to Section 1782 granting leave to obtain third-party discovery from Simon Freakley (*Mr. Freakley*) and AlixPartners LLP (*AlixPartners*) for use in the Arbitration. On November 11, 2011, the Bank of Lithuania appointed Mr. Freakley as Temporary Administrator of Snoras. The Bank of Lithuania is Lithuania's central bank and an organ of the Lithuanian State. Lithuania purported to rely upon the investigation conducted by Mr. Freakley and his then-firm Zolfo Cooper Europe (*Zolfo Cooper*) and on his resulting report as the justification for its expropriation of Snoras. Mr. Freakley's evidence is thus of vital important to the merits of the Arbitration. AlixPartners acquired Zolfo Cooper in 2015. Mr. Freakley is currently CEO of AlixPartners.

Applicant has many questions about Mr. Freakley's tenure as Temporary Administrator of Snoras. Notably, at the time of Mr. Freakley's appointment, it was announced that his

1

investigation into the bank's financial state would last two months.  In the event, the Bank of Lithuania—without explanation—cut the time available for Mr. Freakley's investigation to a mere three days.  Relying on a report apparently produced by Mr. Freakley during that short interval, Lithuania seized all shares in Snoras and expropriated Mr. Antonov's investment in the Bank.  Mr. Antonov never had the opportunity to review or contest Mr. Freakley's findings or recommendations before the Government of Lithuania expropriated his shares in Snoras.  On May 4, 2012, Mr. Antonov submitted a Notice of Dispute to Lithuania pursuant to Article 10 of the Treaty.  In that Notice of Dispute, Mr. Antonov among other things protested Lithuania's unlawful expropriation of his investment in Snoras in breach of the Treaty and accepted Lithuania's standing offer to arbitrate disputes with Russian investors under the Treaty.  Mr. Antonov warned that he would commence arbitration under the Treaty if an agreeable resolution were not reached.  Lithuania refused to negotiate with Mr. Antonov.

On January 23, 2017, Mr. Antonov assigned his Treaty claims against Lithuania to the Fund.  The Fund served Lithuania with a Notice of Arbitration under the Treaty on April 29, 2019, electing to proceed under the UNCITRAL Arbitration Rules.  As set out in the Notice of Arbitration, Applicant intends to prove that Lithuania committed multiple breaches of the Treaty, including by expropriating Mr. Antonov's investment through commissioning a pretextual investigation of the Bank's finances whose outcome was predetermined and which was conducted without affording Mr. Antonov due process.

Applicant accordingly seeks this Court's authorization to serve subpoenas upon Mr. Freakley and AlixPartners for the production of documents and testimony related to Mr. Freakley's appointment as Temporary Administrator; the instructions he received from Lithuanian officials; the nature of the investigation he conducted and its findings, including any reports produced; and

the reception of those findings by Lithuanian officials. Applicant also seeks to depose Mr. Freakley and a representative of AlixPartners about these events.

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or thing for use in a foreign or international tribunal . . . upon the application of any interested person." *See* 28 U.S.C. § 1782(a). This Application satisfies each of Section 1782's statutory requirements: (1) Mr. Freakley and AlixPartners both reside and may be found in this judicial district; (2) the tribunal that will be constituted in the Arbitration pursuant to the UNCITRAL Arbitration Rules is a "foreign or international tribunal" within the meaning of Section 1782; and (3) the Fund, as the party conducting the Arbitration and as Mr. Antonov's assignee, is an "interested person."

As set out below, this Application also satisfies each of the discretionary factors that the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004) instructed district courts to consider in evaluating applications under Section 1782: (1) Respondents will not be participants in the Arbitration and may not be compelled to produce documents by the arbitral tribunal; (2) the discovery sought by this Application is highly relevant to the Arbitration; (3) this Application is not an attempt to circumvent the proof gathering restrictions governing the Arbitration; and (4) producing documents and testimony will not unduly burden Respondents.

For these reasons, and as set forth at greater length below, the Fund respectfully requests that the Court grant the Application.

**BACKGROUND**

A.  **THE RELEVANT ENTITIES**

Applicant, the Fund for Protection of Investor Rights in Foreign States is a corporate entity organized under the laws of the Russian Federation. *See* Declaration of Alexander Yanos ("Yanos Decl."), Ex. 1, Notice of Arbitration ¶ 1.

Mr. Antonov, a Russian national, invested in Snoras with the approval of the Bank of Lithuania between 2006 and 2011, ultimately acquiring a controlling 68.1% stake in Snoras. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 17.

Snoras was a bank organized in Lithuania with operations in several Baltic countries. Yanos Decl. Ex. 1, Notice of Arbitration ¶ 18. Following a three-day "investigation" by Mr. Freakley as Temporary Administrator, Lithuania nationalized Snoras, expropriating Mr. Antonov's shares without due process or compensation. Yanos Decl. Ex. 1, Notice of Arbitration ¶¶ 35-36. Mr. Antonov unconditionally assigned all rights, claims and remedies under the Treaty in respect of the seizure of his shares in Snoras to the Fund on January 23, 2017. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 45.

AlixPartners is an international restructuring firm with its headquarters located in the Southern District of New York. *See* Yanos Decl. Ex 2, AlixPartners Offices. AlixPartners acquired Zolfo Cooper Europe in February of 2015. *See* Yanos Decl. Ex, 3, AlixPartners Zolfo Cooper Press Release. AlixPartners, upon information and belief, has control and custody of Zolfo Cooper Europe's business records including those related to Mr. Freakley's work as Temporary Administrator of Snoras. *See* Yanos Decl. Ex. 3, AlixPartners Zolfo Cooper Press Release.

Simon Freakley, a New York resident, is the CEO of AlixPartners. *See* Yanos Decl. Ex. 4, London Evening Standard Article; Ex. 5, AlixPartners CEO Press Release. Mr. Freakley was

4

appointed as Temporary Administrator of Snoras by the Bank of Lithuania on November 16, 2011. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶¶ 32-33. At that time, Mr. Freakley was affiliated with Zolfo Cooper. *See* Yanos Decl. Ex. 3, AlixPartners Zolfo Cooper Press Release. Mr. Freakley joined AlixPartners in February of 2015 when AlixPartners acquired Zolfo Cooper. *See* Yanos Decl. Ex. 5, AlixPartners CEO Press Release.

Lithuania is a sovereign State in Eastern Europe. The Bank of Lithuania is the organ of the Lithuanian State responsible for the regulation of banking activity in Lithuania.

**B.  THE DISPUTE**

1.  Lithuania Expropriated Mr. Antonov's Shares In Snoras.

In 2006, Mr. Antonov acquired a majority of shares in Snoras, becoming the owner of 68.1% of the Bank's outstanding shares. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 17. Following Mr. Antonov's investment, Snoras grew to be one of the leading banks in Lithuania with an extensive customer network. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶¶ 19, 22. Snoras was regulated by the Bank of Lithuania and subject to routine annual inspections which proceeded without incident for several years. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶¶ 30, 31. At the conclusion of Snoras's 2011 Inspection, however, on November 16, 2011, Lithuanian officials demanded that Snoras respond to alleged defects uncovered by its inspectors, giving them a mere 30 minutes to respond. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 31.

That same day, Lithuania, through the Bank of Lithuania, took additional measures against Snoras by publicly announcing that Snoras was unable to meet its obligations, imposing a moratorium on its activities, announcing that all shares in Snoras were to be nationalized, and announcing the appointment of a temporary administrator. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 32.

That Temporary Administrator was Mr. Freakley.  *See* Yanos Decl. Ex. 1 Notice of Arbitration ¶ 32.  Mr. Freakley's public mandate from the Bank of Lithuania was to take control of Snoras and to issue a report based on his investigation of Snoras's financial condition in two months.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 33.  At the time, Lithuanian officials justified the appointment of a Temporary Administrator by alleging "a real threat the bank [Snoras] is insolvent."  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 33.

On November 16, 2011, Mr. Freakley contradicted that allegation when he publicly announced "the bank does have liquidity, we are currently assessing how much liquidity."  *See* Yanos Decl. Ex. 6, *Reuters* "Lithuania insists banks safe."

On November 20, 2011, (a Sunday), four days after Mr. Freakley had publicly assured investors of Snoras's liquidity, Lithuania directed Mr. Freakley to prepare and submit his final report within three days rather than the two months originally allocated.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 37.  Three days later, Mr. Freakley submitted a report on the financial status of Snoras to Lithuania.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 38.  This time, Mr. Freakley purported to find that the net asset value of the Bank was lower than the value of its liabilities.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 38.  On the very same day, ostensibly on the basis of Mr. Freakley's report, the Bank of Lithuania cancelled Snoras's banking license and began winding up the bank through involuntary proceedings.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 39. These proceedings were held behind closed doors, and counsel for the Bank's majority shareholder were excluded.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 39.

Mr. Freakley's report was never made available to Mr. Antonov or his counsel, making it impossible for him to defend against the allegations it contained.  *See* Yanos Decl. Ex. 1, Notice

6

of Arbitration ¶¶ 38, 40.  Nor was Mr. Antonov ever compensated for the expropriation of his shares.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 40.

On May 4, 2012, Mr. Antonov served a Notice of Dispute upon Lithuania, warning that Lithuania had violated several provisions of the Treaty, including the prohibition at Article 6 on expropriation without due process and compensation.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 3.  In his Notice of Dispute, Mr. Antonov explicitly accepted Lithuania's standing offer to arbitrate disputes with Russian investors contained at Article 10 of the Treaty.  *See* Yanos Decl. Ex. 7, Antonov Notice of Dispute § 4 ¶ 5.  From that point forward, a written arbitration agreement has existed between Mr. Antonov and Lithuania.  *See* Yanos Decl. Ex. 8, the Treaty, Article 10.  Mr. Antonov also warned that if his claims were not satisfactorily resolved through negotiations, he would commence arbitration pursuant to Article 10.  *See* Yanos Decl. Ex. 7, Antonov Notice of Dispute § 4 ¶ 5.

Lithuania acknowledged receipt of Mr. Antonov's Notice of Dispute on June 7, 2012, but took no other action in response to Mr. Antonov's claims.  *See* Yanos Decl. Ex. 9, Reply to Notice of Dispute.  On January 23, 2017, Mr. Antonov assigned all of his claims under the Treaty to Applicant.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 45.

        2.       <u>Lithuania Committed Multiple Treaty Breaches When It Expropriated Mr. Antonov's Investment In Snoras.</u>

In the April 29, 2019 Notice of Arbitration it served on Lithuania pursuant to Article 10 of the Treaty, Applicant detailed the multiple ways in which Lithuania's expropriation of Mr. Antonov's shares in Snoras breached its obligations under the Treaty.

*First*, Lithuania breached Article 6 of the Treaty which prohibits expropriation except (*i*) "*in the public interest*;" (*ii*) "*under due process of law*;" (*iii*) "*without discrimination*;" and (*iv*) "*accompanied by the payment of prompt, adequate and effective compensation*."  *See* Yanos Decl.

7

Ex. 8, Treaty, Article 6(1). Lithuania breached Article 6 of the Treaty because the Bank of Lithuania conducted its 2011 inspection of Snoras in breach of applicable law and procedure, and in particular, failed to provide Snoras's controlling shareholder with any meaningful opportunity to comment on the findings of the inspection which formed the supposed basis for the takeover of the Bank or otherwise defend his interests. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶¶ 38, 40. Lithuania likewise wound up Snoras in closed-door court proceedings that resulted in a judgment of bankruptcy within less than a month, and in which Snoras's controlling shareholder was unable to participate. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 40. The expropriation served no legitimate public policy purpose; discriminated against Russian investors (no other foreign or Lithuanian owned bank was subjected to similar treatment); and was not accompanied by the "prompt, adequate and effective compensation" required under the Treaty. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 50. Indeed, a Provisional Investigation Commission of the Lithuanian Parliament found that the State's decision to take over the Bank was "taken in haste and without sufficient consideration." *See* Yanos Decl. Ex. 10, "Parliamentary panel rules Snoras bank nationalization was hasty and based on shaky evidence." *See also* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 51.

*Second*, Lithuania breached Article 3(1) of the Treaty which obliges it to accord "fair and equitable treatment" to Russian investors through the Bank of Lithuania's imposition of discriminatory lending limitations on Snoras, and its denial of due process to Mr. Antonov in the course of its seizure of Snoras's shares. *See* Yanos Decl. Ex. 8, Treaty. *See* Yanos Decl. Ex. 8, Treaty, Article 3(1).

*Third*, Lithuania breached Article 3(2) of the Treaty which obliges Lithuania to guarantee Russian investors treatment "*no less favourable than the treatment accorded . . . to the investments*

8

*and activities related to such investments of its own investors or the investors of [a] third state.*" *See* Yanos Decl. Ex. 8, Treaty, Article 3(2).  This article gives effect to the international law principles of "national treatment" and "most favored nation" treatment.  Lithuania breached this Article because, as detailed in the Notice of Arbitration, it specifically targeted Mr. Antonov's investment, and did not subject any other local or foreign banking investors to similar treatment. *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 55.

*Fourth*, Lithuania breached Article 2(2) of the Treaty, which obliges Lithuania to guarantee "full protection and security" to Russian investments in Lithuania.  *See* Yanos Decl. Ex. 8, Treaty, Article 2(2).  This Article guarantees not only physical protection by the State, but also the maintenance of an investment environment governed by the apolitical rule of law.  As further set forth in the Notice of Arbitration, Lithuania attacked and expropriated Mr. Antonov's investment for reasons rooted in local politics rather than legitimate regulatory procedures, including in retaliation for Mr. Antonov's ownership—through a wholly-owned Snoras subsidiary, Snoras Media—of a leading independent media group editorially supportive of opposition parties in Lithuania.  *See* Yanos Decl. Ex. 1, Notice of Arbitration ¶ 7.

## THE SCOPE OF DISCOVERY SOUGHT

Mr. Freakley's role as Snoras's Temporary Administrator means that he and AlixPartners possess a substantial body of documents and information highly relevant to the merits of each of the Applicant and Mr. Antonov's claims under the Treaty.

As set forth in the attached draft subpoenas, Applicant seeks to require Mr. Freakley and AlixPartners to produce documents relating to: (*i*) the circumstances of Mr. Freakley's appointment as Snoras's Temporary Administrator and the instructions (official and unofficial) that he and Zolfo Cooper received; (*ii*) the nature, scope, and findings of his investigation of

Snoras; (*iii*) the reception of those findings by the Bank of Lithuania and other Lithuanian officials; (*iv*) and any and all reports prepared by Mr. Freakley and his team for the Bank of Lithuania. Applicant also seeks to depose Mr. Freakley, and a representative of AlixPartners designated pursuant to Fed. R. Civ. Proc. 30(b)(6), about these events. *See* Yanos Decl. Ex. 11-14.

## THE APPLICATION SATISFIES THE THREE STATUTORY REQUIREMENTS FOR DISCOVERY PURSUANT TO SECTION 1782.

Section 1782 permits any party with an interest in a foreign legal proceeding to apply to a district court for assistance in obtaining discovery for use in that foreign proceeding. The statute provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. §1782(a). The statute was enacted to provide "federal-court assistance in gathering evidence for use in foreign tribunals," *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004), and to "encourag[e] foreign countries by example to provide similar means of assistance to our courts." *Brandi-Dohrn v. IKV Deutsche Industriebank AG,* 673 F.3d 76, 80 (2d Cir. 2012). The Application satisfies each of Section 1782's statutory requirements.

### A. THE APPLICATION SEEKS DISCOVERY FROM PERSONS WHO ARE FOUND OR RESIDE WITHIN THIS JUDICIAL DISTRICT.

Section 1782's first statutory requirement is that the person from whom discovery is sought be "found" or "reside" within the district. This requirement has been broadly interpreted. *See In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002) (holding "if a person is served with a subpoena while physically present in the district of the court that issued the discovery order, then for the

10

purposes of § 1782(a), he is 'found' in that district"). Section 1782's first statutory requirement is satisfied here. AlixPartners is organized under the laws of New York with its principal place of business at 909 Third Avenue, New York, New York, 10022. *See* Yanos Decl. Ex. 2, AlixPartners Offices. Mr. Freakley, its CEO, likewise resides in Manhattan and may be found in this judicial district. *See* Yanos Decl. Ex. 4, London Standard Article. Therefore, the first of three statutory requirements for the Court's assistance pursuant to Section 1782 is met.

B. **THE DISCOVERY IS FOR USE IN A PROCEEDING BEFORE A FOREIGN TRIBUNAL.**

Section 1782's second statutory requirement is that the requested discovery be "for use in a proceeding in a foreign or international tribunal." Courts in this and other districts have repeatedly held that an international arbitration conducted pursuant to an investment treaty between two sovereigns is eligible for a federal district court's assistance pursuant to Section 1782. *See*, *e.g.*, *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 291 (S.D.N.Y. 2010) ("a tribunal established by an international treaty. . . and pursuant to UNCITRAL rules" constituted a "foreign tribunal" for purposes of Section 1782); *In re Oxus Gold PLC,* No. 06-82 GEB, 2007 U.S. Dist. LEXIS 24061, at *14 (D.N.J. April 2, 2007) (holding that an arbitral tribunal applying the UNCITRAL Arbitration Rules to a dispute arising under a bilateral investment treaty was a "foreign tribunal" for purposes of Section 1782); *see also In re Chevron Corp.*, 633 F.3d 153, 161 (3d Cir. 2011) (an investment treaty arbitration conducted pursuant to UNCITRAL Arbitration Rules constitutes a foreign tribunal for purposes of 28 U.S.C. §1782); *In re Veiga*, 746 F. Supp. 2d 8, 22-23 (D.D.C. 2010) (same); *Republic of Ecuador v. Bjorkman*, 801 F. Supp. 2d 1121, 1128 n.1 (D. Colo. 2011) (*citing In re Chevron*, 709 F. Supp. 2d at 291) (same). Therefore, the second of three statutory requirements for the Court's assistance pursuant to Section 1782 is met.

C.     **THE APPLICATION IS MADE BY AN INTERESTED PERSON.**

Section 1782's third statutory requirement is that discovery be sought by "an interested person" in the proceeding before a foreign court or tribunal at issue. Under Section 1782, an "interested person" includes anyone who has significant "participation rights" in the relevant foreign proceeding. *See Intel*, 542 U.S. at 256-67. Here, the Fund clearly meets the "interested person" requirement because it is the claimant in the Arbitration. *See In re Esses*, 191 F.3d 873, 875 (2d Cir. 1996) (applicant is an "interested person" when applicant is a "party" to the foreign proceeding). Therefore, the third of three statutory requirements for the Court's assistance pursuant to Section 1782 is met.

## THE DISCRETIONARY *INTEL* FACTORS FAVOR THE APPLICATION.

Provided that the three statutory requirements for judicial assistance under Section 1782 are satisfied, the Supreme Court has identified four factors that district courts are to consider in exercising their discretion to authorize discovery in support of a foreign proceeding. These factors are: (1) whether the person from whom discovery is sought is a party in the foreign proceeding; (2) the nature and character of the foreign tribunal and the receptivity of the foreign tribunal to U.S. judicial assistance; (3) whether the request appears to circumvent foreign proof-gathering procedures of the foreign tribunal; and (4) whether the request is overly intrusive or burdensome. *See Intel*, 542 U.S. at 264-65. All four of the "*Intel* factors" weigh in favor of granting the discovery Applicant seeks here.

Moreover, the Second Circuit has encouraged district courts to exercise their discretion under Section 1782 broadly. *See, e.g.*, *In re Application of Euromepa S.A.*, 51 F.3d 1095, 1102 (2d Cir. 1995) ("We read section 1782's investment of broad discretion in the district courts as an invitation for district judges to fashion creative means of implementing the statute's double goal:

promoting efficiency in international litigation and persuading other nations, by example, to do the same.").

### A.     <u>DISCOVERY IS SOUGHT FROM NON-PARTIES.</u>

The Supreme Court has recognized that the need for assistance under Section 1782 is most acute where, as here, discovery is sought from non-parties to the underlying foreign proceeding. This is because it is unlikely the foreign tribunal will have the power to compel the production being sought. *See Intel*, U.S. 542 at 264 (observing that "nonparticipants in the foreign proceeding may be outside of the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent Section 1782(a) aid"). Indeed, arbitrators appointed under the UNCITRAL Arbitration Rules are ordinarily powerless to compel the production of evidence from third parties.[1] Neither AlixPartners nor Mr. Freakley is a party to the Treaty or to the Arbitration. This first *Intel* factor weighs in favor of granting the Application.

### B.     <u>THE ARBITRAL TRIBUNAL WILL BE RECEPTIVE TO THIS COURT'S ASSISTANCE.</u>

A foreign tribunal's receptivity to judicial assistance is presumed. The Second Circuit has instructed that a party opposing a Section 1782 application must affirmatively demonstrate through "authoritative proof" that the foreign tribunal would be unreceptive to the assistance from the United States Court. *See Euromepa*, 51 F.3d at 1100. Absent such "authoritative proof," district courts "generally should err on the side of permitting the requested discovery." *See In re Gemeinschaftspraxis Dr. Med. Schottdorf*, No. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, *21 (S.D.N.Y. Jan. 4, 2007) (*citing Euromepa*, 51 F.3d at 1100).

---

[1] *See* Yanos Decl. Ex. 15, UNCITRAL Arbitration Rules Article 24.3 ("At any time during the arbitral proceedings the arbitral tribunal may require *the parties* to produce documents, exhibits or other evidence within such a period of time as the arbitral tribunal shall determine.") (emphasis added).

The possibility that certain evidence may not be discoverable under a foreign tribunal's procedures does not displace the presumption that the foreign tribunal would welcome a U.S. district court's assistance pursuant to Section 1782.  *See Intel*, 542 U.S. at 261 (a "foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions-reasons that do not necessarily signal objection to aid from United States federal courts"); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("a district court should not consider the discoverability of the evidence in the foreign proceeding . . . in ruling on a Section 1782 application"); *In re O'Keeffe*, 650 Fed. App'x. 83, 85 (2d Cir. 2016) ("Adelson has not offered evidence that Hong Kong courts are unreceptive to U.S. judicial assistance. . . At most, Adelson has suggested that O'Keeffe seeks evidence which would not be discoverable in Hong Kong.  But . . . our precedents expressly forbid district courts from considering the discoverability of evidence in a foreign proceeding when ruling on [Section] 1782 application.") (citing *Brandi-Dohrn*, 673 F.3d at 81-83).  In any event, there is no reason to believe that an arbitral tribunal constituted in connection with the Arbitration would be unreceptive to this Court's assistance in obtaining evidence highly relevant to the issues before it.  As noted above, federal courts have repeatedly authorized discovery pursuant to Section 1782 in support of arbitrations arising under international treaties and governed by the UNCITRAL Arbitration Rules.  *See*, *e.g.*, *In re Chevron Corp.*, 709 F. Supp. 2d at 291; *Oxus Gold,* 2007 U.S. Dist. LEXIS 24061, at *14.

This second *Intel* factor weighs in favor of granting the Application.

**C.**     **THIS APPLICATION DOES NOT CIRCUMVENT DISCOVERY LIMITS.**

Section 1782 is not to be used as a means to evade restrictions imposed by foreign courts and tribunals.  *See e.g. In re Microsoft Corp.,* 428 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2006)

14

(rejecting a 1782 application where requests were pending before or explicitly denied by the foreign court). That arbitration procedures may provide for less extensive discovery than is available in U.S. litigation is, however, not a basis to conclude that a party seeking Section 1782 assistance is attempting to circumvent a foreign tribunal's limits on discovery. *See Mees v. Buiter*, 793 F.3d 291, 304 n.20 (2d Cir. 2015) ("That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means."); *In re Application of Accent Delight Int'l, Ltd.,* No. 16-MC-125 (JMF), 2018 U.S. Dist. LEXIS 97673, at * 15 (S.D.N.Y. June 11, 2018) (explaining that the third *Intel* factor is concerned with whether there are in the foreign jurisdiction "'rules akin to privileges that *prohibit* the acquisition or use of certain materials,' not whether it has 'rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information'") (citing *Mees*, 793 F.3d at 303 n. 20) (emphasis in original)). The UNCITRAL Arbitration Rules include no such limits, and, as discussed above, Section 1782 assistance is routinely granted in arbitrations governed by the UNCITRAL Arbitration Rules.

This third *Intel* factor weighs in favor of granting the Application.

### D.   THE REQUESTED DISCOVERY WILL NOT IMPOSE AN UNDUE BURDEN.

Finally, the fourth *Intel* factor instructs the Court to consider whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. In considering this factor, a court is to determine whether the requested discovery is "sufficiently tailored to the litigation issues for which production is sought." *See*, *e.g.*, *In re Gemeinschaftspraxis Dr. Med. Schottdorf*, 2006 U.S. Dist. LEXIS 3844464, at *8. Here, Applicant seeks discovery with respect to Mr. Freakley's appointment and instructions as Temporary Administrator, his investigation of Snoras, and his Report to the Bank of Lithuania. The requested discovery is appropriately tailored to Mr.

15

Freakley's involvement in the events giving rise to the Arbitration. At the same time, any burden imposed by compliance with the proposed subpoenas should be minimal: the documents Applicant seeks should all have been maintained by Zolfo Cooper and subsequently by AlixPartners in the ordinary course of business and Mr. Freakley will not need to travel any appreciable distance for his deposition.

## CONCLUSION

For the forgoing reasons, the Court should issue an order pursuant to 28 U.S.C § 1782(a): (1) granting this Application; (2) authorizing issuance of the subpoenas in the form of Exhibits 11 through 14 to the attached Declaration of Alexander Yanos; (3) directing Mr. Freakley and AlixPartners to comply with the same; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: August 29, 2019
      New York, New York      Respectfully submitted,

Alexander Yanos
Carlos Ramos-Mrosovsky
Rajat Rana
Hanna Robbins
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016
Tel: 212-210-9400
Fax: 212-210-9471
alex.yanos@alston.com
carlos.ramos-mrosovsky@alston.com
rajat.rana@alston.com
hanna.robbins@alston.com

*Attorneys for Applicant,*
*Fund for the Protection of Investor Rights*
*in Foreign States*