IN THE ARBITRATION UNDER THE AGREEMENT BETWEEN THE GOVERNMENT OF THE RUSSIAN FEDERATION AND THE GOVERNMENT OF THE REPUBLIC OF LITHUANIA ON THE PROMOTION AND RECIPROCAL PROTECTION OF THE INVESTMENTS

BETWEEN

FUND FOR PROTECTION OF INVESTORS' RIGHTS IN FOREIGN STATES,

*Claimant*

–and–

THE REPUBLIC OF LITHUANIA,

*Respondent*

---

## NOTICE OF ARBITRATION
_____

ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel:   212-210-9400
Fax:   212-210-9444

–and–

Egorov Puginsky Afanasiev & Partners
21, 1st Tverskaya-Yamskaya Str.
125047, Moscow, Russia
Tel: +7(495) 935 80 10
Fax: +7 (495) 935 80 11

Counsel for Claimant

I.  **INTRODUCTION**

1. Fund for Protection of Investors' Rights in Foreign States (*the Fund*), a Russian investment fund, hereby requests the institution of arbitration proceedings against the Republic of Lithuania (*Lithuania* or *the State*) in accordance with Article 3 of the UNCITRAL Arbitration Rules 1976 (*UNCITRAL Arbitration Rules*).

2. The Fund submits this Notice of Arbitration (the *Notice*) pursuant to Article 10(2)(d) of the Agreement Between the Government of the Russian Federation and the Government of the Republic of Lithuania on the Promotion and Reciprocal Protection of the Investments signed on 29 June 1999 and entered into force on 24 May 2004 (*the Treaty*).[1]

3. The Fund acquired this claim against Lithuania from Vladimir Antonov (*Mr. Antonov*),[2] a Russian national, after Mr. Antonov notified Lithuania of his intent to submit the present claims to arbitration on 4 May 2012 (the *Notice of Dispute*).[3]

4. The Fund has duly authorized the undersigned to institute and pursue arbitration proceedings on its behalf against Lithuania pursuant to the Treaty and UNCITRAL Arbitration Rules.[4] Furthermore, the Fund has waived its right to initiate or continue proceedings with respect to the impugned measures before any administrative tribunal or court in Lithuania in accordance with Article 1 of the Protocol to the Treaty.

5. The Fund brings this claim in relation to Lithuania's measures that had destroyed the value of Mr. Antonov's controlling shareholding in AB bankas SNORAS (*Snoras or the Bank*), a bank based in Lithuania.

6. Mr. Antonov invested in Lithuania's banking sector by acquiring 68.1% of Snoras' shares. Since then, Snoras grew from the seventh largest bank in Lithuania by capital and

---

[1] Agreement between the Government of the Russian Federation and the Government of the Republic of Lithuania on the Promotion and Reciprocal Protection of the Investments, **C-01**. The Treaty entered into force on 24 May 2004.

[2] Additional Agreement No. 2 dated 7 March 2019 to the Cession Agreement on the Assignment of Rights (claims) dated 23 January 2017, **C-02**.

[3] Notice of Dispute dated 4 May 2012, **C-03**.

[4] Power of Attorney dated 25 April 2019, **C-04**.

sixth by assets to become the fifth largest bank in Lithuania, holding more than USD 3 billion in assets and USD 2.5 billion in deposits.

7. Snoras' continuous growth in Lithuania and its Baltic neighbors, however, alarmed the Lithuanian government that came to power in 2008. The new government made its antipathy to Russian investments in Lithuania public. Subsequently, the Lithuanian government expressed increasing concern in Mr. Antonov's controlling shareholding in Snoras for at least two reasons:

   a) Mr. Antonov's control over Snoras meant that a Russian investor controlled Lithuania's fifth largest bank at a time of political tensions between Russia and its Baltic neighbors;

   b) Mr. Antonov, through Snoras' wholly owned subsidiary, Snoras Media, acquired control of Lietuvos Rytas, a Lithuanian liberal media holding, in 2009. Lietuvos Rytas' editorial slant critical of Lithuania's government and, in particular, President Dalia Grybauskaite. In fact, Lithuanian officials repeatedly warned Mr. Antonov that continued negative coverage of the government by Lietuvos Rytas would lead to the government taking steps to punish Snoras.

8. When Mr. Antonov failed to heed these warnings from the State, Snoras became the target of a series of escalating governmental measures that culminated in its total expropriation.

9. On 16 November 2011, the Bank of Lithuania announced, without any factual basis, that Snoras' assets were insufficient to meet its liabilities, suspended its operations, and appointed a temporary administrator. That same day, the Government announced in Parliament that Snoras' shares were to be seized in the public interest.

10. The temporary administrator appointed by the Bank of Lithuania had originally been mandated to issue a report on Snoras' status in two months. However, on 20 November 2011, the Lithuanian authorities ordered the administrator to complete his report within 3 days or by 23 November 2011. The Bank of Lithuania thereupon cancelled Snoras' operating license on 24 November 2011.

11. Through these unlawful measures Lithuania deprived Mr. Antonov of his controlling stake in Snoras without any compensation in violation of due process.

12. Mr. Antonov notified Lithuania of his intent to submit the present claims to arbitration through a Notice of Dispute dated 4 May 2012. Mr. Antonov subsequently unconditionally and fully assigned his claims against Lithuania to the Fund.

13. In this Notice, the Fund will establish the jurisdictional and substantive bases of these treaty claims. Specifically, the Fund will show that:

    a) Lithuania's measures interfered with Mr. Antonov's investment and ultimately deprived Mr. Antonov of his investment unlawfully and without compensation (**Section II** below);

    b) Lithuania's measures breached Lithuania's obligations under the Treaty and under international law (**Section III** below);

    c) Mr. Antonov is a Russian investor whose investment in Lithuania was protected by the Treaty (**Section IV** below); and

    d) The Fund is entitled to initiate these arbitration proceedings because both Lithuania and the Fund have consented to arbitration under the UNCITRAL Arbitration Rules and because all of the conditions to access the arbitration under the Treaty have been fulfilled (**Section V** below).

14. In **Section VI** below, the Fund proposes a method to constitute the three-member Tribunal to adjudicate this dispute, along with other procedural matters. The names and addresses of the parties are set out in **Section VII**. The Fund sets out its request for relief in **Section VIII.**

15. This Notice of Arbitration is accompanied by a bundle of exhibits numbered **C-01** to **C-34**.

16. The Fund reserves its right to specify, supplement or amend the factual or legal claims and arguments herein.

## II.   THE FACTS RELEVANT TO THE DISPUTE

**A.**   **Mr. Antonov's Investment in Lithuania**

17. In 2006, Mr. Antonov acquired a majority of Snoras' shares with the approval of the Bank of Lithuania.[5] Subsequently, Mr. Antonov purchased additional newly issued shares. As a result, Mr. Antonov became the owner of 68.1% of the Bank's outstanding shares.[6]

18. Snoras grew in the years following Mr. Antonov's investment. By 2011, Snoras became the fifth largest bank in Lithuania in terms of asset value,[7] holding more than USD 3 billion in assets and USD 2.5 billion in deposits,[8] while providing a diverse array of corporate and retail banking services to customers in Lithuania and other Baltic countries.

19. By 2011, the Bank had the largest network of banking services in Lithuania and had 12 branches in Lithuania, Estonia, Latvia, and 256 operating outlets. Snoras' assets included:

    *(i)*   the largest banking network in Lithuania with 1130 employees and nearly 1.135 million clients;[9]

    *(ii)*  Finasta, another Lithuanian bank; and

    *(iii)* a majority stake in Latvijas Krajbanka, a Latvian bank.

20. Notably, Snoras: (*i*) was solvent and compliant with International Financial Reporting Standards adopted by the European Union; and (*ii*) received a long-term issuer default rating of B+ with a stable outlook from Fitch[10] as well as Ba3 Long-term Obligations Rating with a stable outlook from international rating agency Moody's.[11]

21. At the same time, the Bank developed a significant customer network. Among the Bank's clients were: the Ministry of Internal Affairs of Lithuania, the Police Department

---

[5] Resolution of the Board of the Bank of Lithuania No. 143 dated 9 November 2006, **C-05.**

[6] Prospectus of shares, approved by the Securities Commission of the Republic of Lithuania on 3 February 2011, section 1.9, **C-06**.

[7] Based on the unaudited financial statements dated 30 September 2010 (see Prospectus of shares, approved by the Securities Commission of the Republic of Lithuania on 3 February 2011, section 1.7.1, **C-06**).

[8] Bank's balance sheet dated 15 November 2011, **C-07**.

[9] Prospectus of shares, approved by the Securities Commission of the Republic of Lithuania on 3 February 2011, section 4.5.1, **C-06.**

[10] See a press release on the Bank's website "International rating agency Fitch Ratings affirmed AB Bank SNORAS ratings" dated 15 April 2010, **C-08**.

[11] See a press release on the Bank's website "International rating agency Moody's has assigned a new Long-term Obligations Rating with a stable outlook to SNORAS Bank" dated 29 September 2006, **C-09.**

of Lithuania, the State Social Insurance Fund of Lithuania, the State Property Fund of Lithuania, Lithuanian Railways, Lithuanian National Olympic Committee, the State Sea Port of Klaipeda (Lithuania's largest), Lithuanian Radio and Television Center, Vilnius University, Klaipeda University and others.[12]

22. Between 2007-2011, Snoras showed positive dynamics in all key financial indicators. In 2009, the price of the Bank's registered ordinary shares grew by more than 250%;[13] the Bank attracted over 2400 new corporate clients;[14] the deposit portfolio of the Bank increased by 25.8 per cent or 3.5 times faster than the entire deposit market of Lithuania.[15] The Bank's shares listed on the NASDAQ OMX Vilnius Stock Exchange starting on 1 July 2011, and were included in the "OMX Baltic 10" index.[16]

23. Due to the expansion of its activities and growth of the main economic parameters, Snoras received international recognition on multiple occasions. In 2009, one of the world's largest banks, German "Commerzbank AG" granted a special award to the Bank for high quality of international money transfers.[17] "The Banker", a prestigious world banking and finance magazine published by the British newspaper "Financial Times", awarded Snoras with the title – the best bank in Lithuania in 2010.[18] In 2010, the Bank Snoras group was recognized as the best financial group in the Baltic States.[19]

## B. The Lithuanian State's Attack on the Bank

---

[12] Form No. 7004 dated 1 November 2011, **C-10**.

[13] See a press release on the Bank's website "In 2009 the price of Bank SNORAS shares grew by 163 per cent" dated 5 January 2010, **C-11.**

[14] See a press release on the Bank's website "In 2009 Bank SNORAS attracted 2400 new corporate clients" dated 12 January 2010, **C-12**.

[15] See a press release on the Bank's website "Bank SNORAS deposit portfolio increased almost by LTL 1 billion within a year" dated 19 February 2010, **C-13.**

[16] See a press release on the Bank's website "Bank SNORAS shares are included in the composition of the trading index "OMX Baltic 10", dated 16 June 2011, **C-14.**

[17] See a press release on the Bank's website "AB Bank SNORAS plans to provide financial services in Germany" dated 20 April 2010, **C-15.**

[18] See a press release on the Bank's website "The Banker" international magazine published by "Financial Times" recognized Bank SNORAS as "The best bank in Lithuania in 2010" dated 7 December 2010, **C-16.**

[19] See a press release on the Bank's website "World Finance" magazine recognized Bank SNORAS group as the best banking group in the Baltic States" dated 22 July 2010, **C-17.**

24. Notwithstanding the above, Lithuania took arbitrary, non-transparent, and discriminatory measures that deprived Mr. Antonov of his investment in Snoras and destroyed the value of the investment. Lithuania's measures included: (*i*) forcing Snoras to significantly reduce its business with Russian borrowers; (*ii*) obstruction of the increase of Snoras' authorized capital and appropriation of Mr. Antonov's payment for the newly issued shares; (*iii*) a highly disruptive, unlawful, and adversarial inspection of Snoras in 2011; (*iv*) suspension of Snoras' activities and the highly irregular appointment of a temporary administrator, Simon Freakley of the international restructuring firm AlixPartners (**Mr. Freakley**); (*v*) unlawful seizure of Snoras' shares; (*vi*) revocation of Snoras' license; and (vii) commencement of criminal investigation against Mr. Antonov.

### (i) Lithuania Forced Snoras to Reduce Business with Russian Borrowers

25. In January 2011, the Bank of Lithuania forced Snoras to significantly reduce its business with Russian borrowers, imposing a cap by which the Bank's total Russian loans could not exceed 50% of its capital.[20] To comply with the Bank of Lithuania's requirement, Snoras had to sell part of the loan portfolio to Eagulus Peak Investment Ltd and Virmanius Holdings Ltd. As the result of these transactions, the Bank suffered losses amounting to more than LTL 20 million (around USD 8 million), which adversely impacted the Bank's operations for the next 6 months of 2011.[21]

26. Lithuania did not require any other bank in Lithuania to reduce its business with non-Lithuanian entities.[22] When Snoras complained to the Bank of Lithuania, it was advised that the decision to restrict its business in this manner had come from President Grybauskaite herself.[23]

### (ii) Lithuania Obstructed the Increase of Snoras' Authorized Capital and Appropriated Mr. Antonov's Payment for the Newly Issued Shares

27. During the general meeting which took place in December 2010, Snoras' shareholders decided to increase the authorized capital of the Bank by LTL 380,082,893.[24] The

---

[20] Resolution of the Bank of Lithuania No. 03-2 dated 18 January 2011, clause 3.2, **C-18.**

[21] Letter from Snoras to the Bank of Lithuania No. C 06 – 08601/11 dated 11 July 2011, clause 12.2, **C-19.**

[22] Notice of Dispute dated 4 May 2012, ¶ 3(5), **C-03**.

[23] Notice of Dispute dated 4 May 2012, ¶ 3(5), **C-03**.

[24] Prospectus of shares, approved by the Securities Commission of the Republic of Lithuania on 3 February 2011, section 3.4, **C-06**.

contribution was to be made through the issuance of 380,082,893 ordinary registered shares of LTL 1 nominal value.[25] The Bank's new share emission prospectus was approved by the Securities Commission of Lithuania on 3 February 2011.[26]

28. A large part of this share issuance was acquired *inter alia* by Mr. Antonov for approximately LTL 200,483,000 (USD 77 million).[27] The money paid for the newly issued shares was put on a savings account in another bank (***"Finasta" Bank***) pending the Bank of Lithuania's approval and registration of the corresponding amendments to Snoras' Articles of Association. However, the Bank of Lithuania repeatedly shifted the date of response to the Snoras' application for the approval of the mentioned amendments until finally, in November 2011, it simply refused to approve such amendments. Sums paid for the new shares and held in "Finasta" Bank, including Mr. Antonov's payment of approximately USD 77 million, were subsequently expropriated by Lithuania.

### (iii) Lithuania's Highly Disruptive and Adversarial Annual Inspection of Snoras

29. Lithuania's measures against Snoras became even more aggressive after Mr. Vitas Vasiliauskas, an ally of President Grybauskaite, was named Chairman of the Bank of Lithuania in April of 2011. There was a perceptible change in the tenor of the Bank of Lithuania's annual regulatory inspection of Snoras.

30. In contrast to prior years, the annual inspection by the Bank of Lithuania was conducted in a manner that deprived Snoras of its right to comment on the inspection's findings. Standard procedure under the Bank of Lithuania's own regulations called for a regulated bank's management to be invited to provide comments on the Bank of Lithuania's findings within 15 days after the completion of the inspection and to be provided with a signed written inspection report within 20 days after the completion of the annual inspection.[28]

---

[25] *Ibid*.

[26] Statement of the Securities Commission of the Republic of Lithuania on the approval of the prospectus No. 4R-1 dated 3 February 2011, **C-20**.

[27] See a press release on the Bank's website "Bank SNORAS during the first stage of distributing the shares attracted LTL 368 million" dated 29 March 2011, **C-21**.

[28] Regulations on the Inspection of the Banks approved by Resolution No. 157 of the Board of the Bank of Lithuania dated 23 September 2004, **C-22**.

31. However, Snoras' 2011 inspection concluded very differently. The Bank of Lithuania refused to provide Snoras with any official document as to the outcome of the inspection. Instead, on 16 November 2011, the Bank of Lithuania's officials faxed a memo to Snoras demanding that its officers report to the Bank of Lithuania to respond to the alleged defects uncovered by its inspectors and affording them no more than 30 minutes to consider their response. It was of course impossible for Snoras to make an effective response in such a short time – as was the intention.

### (iv) Lithuania Suspended Snoras' Activities and Appointed a Temporary Administrator

32. That same day, the Bank of Lithuania publicly announced that Snoras was unable to meet its obligations, imposed a moratorium on its activities,[29] and announced the appointment of Mr. Freakley as a temporary administrator (***Resolution No. 03-186***).[30]

33. Mr. Freakley's public mandate was to take control of Snoras and to issue a report on Snoras' financial condition in two months.[31] The Bank of Lithuania explicitly justified its appointment of a temporary administrator with reference to the results of the recently concluded inspection, alleging that "*there is a real threat that the bank is insolvent*".[32]

### (v) Lithuania's Seizure of Snoras' Shares

34. That same day, on 16 November 2011, the Government adopted Resolution No. 1329 "On Seizure of AB Snoras Bank Shares for Public Needs" (***Resolution No. 1329***) whereby all shares in Snoras were to be seized by the Lithuanian State "for public needs" upon payment of compensation to the shareholders.[33]

35. The Lithuanian Government simultaneously carried out a physical taking of Snoras on 16 November 2011, when several police officers arrived together with about ten representatives of the Bank of Lithuania and took over the Bank's operations. Among

---

[29] Resolution of the Bank of Lithuania No. 03-186 dated 16 November 2011, **C-23.**

[30] Mr. Freakley is now the CEO of Alix Partners, based in New York. We understand that Swedish bank regulators recommended Mr. Freakley to the Bank of Lithuania.

[31] Resolution of the Bank of Lithuania No. 03-186 dated 16 November 2011, clause 6.1, **C-23**.

[32] *Id.*, clause 3, **C-23.**

[33] Resolution of the Government of the Republic of Lithuania No. 1329 "On Seizure of AB Snoras Bank Shares for Public Needs" dated 16 November 2011, **C-24.**

other things, these agents of the Lithuanian State deactivated Snoras' connection to the SWIFT settlement system.[34] It goes almost without saying that this extreme measure damaged the Bank's financial position by impairing its ability to provide banking services.

36. Mr. Antonov never received any compensation for the expropriation of his investment in Lithuania.

### (vi) Revocation of Snoras' License and Bankruptcy Proceedings

37. On 20 November 2011 (a Sunday), the Bank of Lithuania directed Mr. Freakley to prepare and submit his final report within <u>three days</u>, by 23 November 2011, rather than in the two months originally allocated.[35] It was also decided to change the terms of the moratorium to 5 working days (instead of 2 months).[36]

38. Three days later, on 24 November 2011, Mr. Freakley submitted a report on the financial status of Snoras to the Bank of Lithuania purporting to find that the net asset value of the Bank was lower than the value of its liabilities.[37] Mr. Freakley's report is not publicly available and has been classified as a State secret by the Lithuanian special services.

39. On the same day, the Bank of Lithuania, having considered the conclusions and proposals made by Mr. Freakley, revoked Snoras' license and asked the District Court of Vilnius to institute bankruptcy proceedings in respect of Snoras.[38]

40. Mr. Antonov and the Bank were not afforded any opportunity to defend themselves in these proceedings. On 29 November 2011, the District Court of Vilnius declared that the bankruptcy proceedings instituted in respect of Snoras were to take place behind closed

---

[34] *See:* Expert Report of Malcolm Cohen & Andrew Caldwell dated 19 March 2012 (The First BDO Report), p. 17, **C-25.**

[35] Decision of the Bank of Lithuania Board No. 03-193 "On Instructions to the Temporary Administrator of Snoras Bank Public Company and Partial Revocation of Restrictions on the Activities of the Bank" dated 20 November 2011, **C-26.**

[36] *Ibid*, **C-26**.

[37] Decision of the Bank of Lithuania Board No. 03-196 "On the Insolvency of Bank Snoras, a Joint Stock Company, on Withdrawal of its Banking License and Appealing to Court for Institution of Bankruptcy Proceedings" dated 24 November 2011, **C-27.**

[38] *Ibid,* **C-27.**

doors without participation of Mr. Antonov.[39] On 7 December 2011, the District Court of Vilnius declared Snoras bankrupt.[40]

### (vii) Lithuania Commenced Criminal Investigation Against Mr. Antonov

41. While these steps were being taken against Snoras, the Lithuanian Prosecutor General's office simultaneously acted against Mr. Antonov personally by launching a criminal investigation alleging that he had precipitated Snoras' collapse by siphoning some USD 366 million in bank funds into personal Swiss accounts.[41]

## C. Notification Of The Dispute

42. On 4 May 2012, Mr. Antonov submitted a Notice of Dispute advising Lithuanian authorities of his intent to submit the present dispute to arbitration pursuant to Article 10 of the Treaty.[42]

43. Lithuania received Mr. Antonov's Notice of Dispute on 7 June 2012.[43]

44. In the Notice of Dispute Mr. Antonov formally requested amicable resolution, triggering the consultation period under Article 10 of the Treaty. Despite Mr. Antonov's efforts to seek an amicable resolution, seven years later, no agreement has been reached and Lithuania has made no effort to reach one.

## D. Mr. Antonov's Assignment of Claims to the Fund

45. On 23 January 2017, Mr. Antonov unconditionally assigned all his rights, claims and remedies arising out of Lithuania's measures that destroyed the value of his investments in Snoras to the Fund.[44]

---

[39] Ruling of the District Court of Vilnius dated 29 November 2011, civil case No. B2-7791-611/2011, **C-28.**

[40] Ruling of the District Court of Vilnius dated 7 December 2011, civil case No B2-7791-611/2011, **C-29**.

[41] Part 1 Certificate Issued Pursuant to Section 2(7) of the Extradition Act 2003 dated 24 November 2011, **C-30**.

[42] In particular, Mr Antonov notified the President, the Prime Minister, the Minister of Justice, the Minister of Foreign Affairs, the Minister of Finance and Chairman of the Board of the Bank of Lithuania of. *See* Notice of Dispute dated 4 May 2012, **C-03**.

[43] Letter of Ministry of Finance of the Republic of Lithuania dated 17 July 2012 No. ((7.63-02)-5L-1210202)-6K-1206187, **C-31**.

[44] Additional Agreement No. 2 dated 7 March 2019 to the Cession Agreement on the Assignment of Rights (claims) of 23 January 2017, **C-02**.

46. Therefore, the Fund, as an assignee of Mr. Antonov's claim against Lithuania, is pursuing this arbitration against Lithuania.

### III. LITHUANIA'S VIOLATIONS OF THE TREATY

47. Lithuania's conduct violates the Treaty and international law and triggers Lithuania's State responsibility as explained below. The Fund will submit detailed evidence at the appropriate stage of the proceedings to quantify the losses suffered.

48. In the case at hand, Lithuania breached its obligations under the following provisions of the Treaty:

    (A) Article 6: Expropriation and Compensation;

    (B) Article 3.1: Fair and Equitable Treatment;

    (C) Articles 3.2: National Treatment and Most Favoured Nation Treatment;

    (D) Article 2.2: Full Protection and Security.

### A. Lithuania Unlawfully Expropriated Mr. Antonov's Investment without Prompt, Adequate and Effective Compensation

49. Article 6 of the Treaty prohibits expropriation except for (*i*) "*in the public interest;*" (*ii*) "*under due process of law;*" (*iii*) "*without discrimination;*" and (*iv*) "*accompanied by the payment of prompt, adequate and effective compensation.*"[45]

50. Lithuania has breached its obligation under Article 6 of the Treaty by unlawfully expropriating Mr. Antonov's investment – his controlling shareholding in Snoras (¶ 34). Lithuania deprived Mr. Antonov of the control, use, enjoyment and economic value of its investment in Lithuania. The expropriation was illegal for the following reasons.

    a) *First*, there was no legitimate public policy purpose whatsoever – rather a political animus – for the expropriation of Mr. Antonov's investment.

---

[45] *See* Treaty, Article 6(1) ("The investments of the investors of one Contracting Party made in the territory of the other Contracting Party shall not be subject to expropriation, nationalisation or other measures equivalent to expropriation or nationalisation (hereinafter referred to as 'expropriation') unless these measures are carried out in the public interest and under due process of law, are carried out without discrimination and are accompanied by the payment of prompt, adequate and effective compensation."), **C-01**.

b) *Second*, Lithuania acted without due process. The Bank of Lithuania conducted the 2011 inspection of Snoras in breach of the applicable law and procedure, in particular, by failing to provide Snoras with the documents or a meaningful opportunity to comment on the outcome of the inspection (¶¶ 29-31). Subsequently, Lithuania's appointed administrator, Mr. Freakley, hastily and erroneously appraised the financial conditions of Snoras (¶ 38). Finally, Lithuania began winding up Snoras in closed-door court proceedings that resulted in a judgment of bankruptcy within less than a month (on 7 December 2011) (¶ 40).

c) *Third*, Lithuania's seizure of Snoras' shares was discriminatory as no other Lithuanian or foreign bank was subjected to alike measures (¶ 26).

d) *Fourth and finally*, Lithuania has never offered Mr. Antonov any compensation for the seizure of his shares in Snoras (¶ 35). Lithuania's expropriation of Mr. Antonov's investment was accordingly unlawful and breached Article 6 of the Treaty.

51. Notably, the unlawfulness of the State's actions is vividly demonstrated by the conclusions of the Provisional Investigation Commission of the Seimas formed on 30 January 2012 specifically to investigate the situation in the Bank (*the Commission*). In particular, the Commission in its preliminary findings stated, among other things:

   a. No documents or any other evidence proving that the Bank's assets decreased in value were submitted to the Commission;[46]

   b. The State's decisions to take over the Bank's shares for public needs and to initiate a bankruptcy case against the bank were taken in haste and without sufficient consideration;[47]

   c. The State did not consider all the circumstances and possible consequences when taking a decision to nationalize the Bank.[48]

---

[46] Conclusions of the Provisional Investigation Commission of the Seimas dated 30 May 2012, para. 12, **C-32**.

[47] *Id.*, para. 13, **C-32**.

[48] *Id.*, para. 14. **C-32**.

13

B.  **Lithuania Failed to Accord Fair And Equitable Treatment to Mr. Antonov's Investment**

52. Article 3(1) of the Treaty obliges Lithuania to accord "*investments made by investors of the other Contracting Party and activities related to such investments fair and equal treatment*".[49]

53. Lithuania has breached its obligation under Article 3(1) of the Treaty by taking unfair and inequitable measures with respect to Mr. Antonov's investments, including, without limitation, the Bank of Lithuania's discriminatory limitations on Snoras' lending capacity to Russian customers (¶ 25) and lack of due process in the course of its seizure of Snoras' shares (¶ 36). Lithuania is accordingly in breach of Article 3(1) of the Treaty.

C.  **Lithuania Failed to Guarantee National and Most Favoured Nation Treatment to Mr. Antonov's Investment**

54. Article 3(2) of the Treaty obliges Lithuania to guarantee "*at least no less favourable than the treatment accorded by the Contracting Party to the investments and activities related to such investments of its own investors or the investors of the third state*".[50] This article encompasses two types of guarantees provided to foreign investment: national treatment and most favoured nation treatment.

55. Lithuania specifically targeted its measures only at Mr. Antonov's investment, whilst no other Lithuanian or foreign banks have been subjected to similar approach (¶ 26). Lithuania is accordingly in breach of Article 3(2) of the Treaty.

---

[49] Treaty, Article 3(1) ("*Each Contracting Party shall accord in its territory to the investors, investments made by investors of the other Contracting Party and activities related to such investments fair and equal treatment, which excludes the application of discriminatory measures impeding management, maintenance, use, enjoyment and disposal of the investment.*"), **C-01**.

[50] Treaty, Article 3(2) ("*The treatment, set forth in the paragraph 1 of this Article, shall be at least no less favourable than the treatment accorded by the Contracting Party to the investments and activities related to such investments of its own investors or the investors of third state.*"), **C-01**.

### D.     Lithuania Failed to Guarantee Full Protection And Security for Mr. Antonov's Investment

56. Article 2(2) of the Treaty obliges Lithuania to guarantee "*full protection and security*" for Russian investments in Lithuania.[51] This standard guarantees the Investor not only physical protection by the State, but also the maintenance of an investment environment governed by the apolitical rule of law.

57. Lithuania breached its obligation under Article 2(2) of the Treaty by failing to maintain a secure investment environment for Mr. Antonov's investment. Snoras was nationalized amid geopolitical tensions between Russia and Lithuania for reasons that reflected Lithuania's internal politics and not the impartial application of the rule of law. Rather than comply with its obligation to maintain a secure investment environment, Lithuania harmed and ultimately expropriated Mr. Antonov's investment for reasons rooted in politics rather than legitimate regulatory procedures. Lithuania is accordingly in breach of Article 2(2) of the Treaty.

### IV.     MR. ANTONOV'S INVESTMENTS ARE PROTECTED UNDER THE TREATY

### A.     The Fund is a Protected Investor Under the Treaty

58. Article 1(1) of the Treaty defines, in relevant part, an "*investor*" as follows:

> "*a) any natural person who is a national of the state of this Contracting Party according to the legislation of this Contracting Party and authorized to invest in the territory of the other Contracting Party according to the legislation of the latter Contracting Party*
>
> *b) in respect of the Russian Federation:*
>
> *any legal person, constituted or established according to the legislation in force in the territory of the Russian Federation provided this legal person is authorized according to the legislation of the Russian Federation to invest in the territory of the Republic of Lithuania.*"

---

[51] Treaty, Article 2(2) ("*Each Contracting Party in accordance with its legislation shall guarantee to the investors of the other Contracting Party full protection and security of the investments made by the investors of the other Contracting Party.*"), **C-01**.

15

59. As a Russian national,[52] Mr. Antonov qualifies as a protected investor under the Treaty. Likewise, as an assignee of Mr. Antonov's claims against Lithuania under the Treaty, the Fund, a Russian legal person,[53] equally qualifies as an investor under the Treaty.

**B.   Mr. Antonov's Investments are Protected Under the Treaty**

60. Article 1(2)(b) of the Treaty defines an "*investment*" as "*shares, stocks, bonds and other forms of participation in the enterprises and companies.*"

61. Mr. Antonov's controlling shareholding in Snoras, thus, qualifies as an investment under the Treaty.

**V.   THE PARTIES' CONSENT TO ARBITRATION UNDER THE TREATY**

62. The Fund has fulfilled all the requirements for access to arbitration under the Treaty, as explained below.

63. Lithuania's consent to submit investment disputes with foreign investors to UNCITRAL arbitration is provided in the Treaty under Article 10 of the Treaty, which reads as follows:

> «*1. In a case of any dispute between one Contracting Party and the investor of the other Contracting Party concerning the investments, including the disputes regarding amount, conditions or procedure of payment of the compensation, and the procedure of transfers, referred to respectively in the Articles 6 and 8 of this Agreement, a written notification, which includes detailed explanation, is submitted by the investor to the Contracting Party, which is a party of the dispute. The parties of the dispute shall endeavour to settle such dispute, if possible, by the way of negotiations.*
>
> *2. If such dispute cannot be settled amicably within six months from the date of the written notification referred to in paragraph 1 of this Article, the dispute, at the request of either party and at the choice of an investor, shall be submitted to:*

---

[52] Mr. Antonov's Passport of the Citizen of the Russian Federation dated 25 December 2001 No. 45 01 495273, **C-33**.

[53] Certificate of the Federal Tax Service of the Russian Federation on State Registration of the Fund dated 28 March 2016, **C-34**.

> *a) competent court or court of arbitration of the Contracting Party in which territory the investments are made;*
>
> *b) the Arbitration Institute of the Stockholm Chamber of Commerce;*
>
> *c) the Court of Arbitration of the International Chamber of Commerce;*
>
> *d) an ad hoc arbitration in accordance with Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).»*

64. The requirements of the Treaty to submit the dispute to arbitration have been satisfied in this case:

    a) Mr. Antonov accepted Lithuania's offer to submit the present dispute to arbitration by serving a written Notice of Dispute on Lithuania on 4 May 2012;

    b) more than six months have elapsed since Lithuania received Mr. Antonov's Notice of Dispute on 7 June 2012; and

    c) the parties have failed to amicably settle the dispute.

65. In light of the above, the conditions precedent to submission of a claim to arbitration under the Treaty are satisfied.

## VI. METHOD OF APPOINTMENT OF THE ARBITRAL TRIBUNAL AND OTHER PROCEDURAL MATTERS

66. Given that the parties have not reached an agreement on the number of arbitrators, the Fund proposes Lithuania that the Tribunal to be appointed in this case shall be composed of three arbitrators.

67. The Fund will notify Lithuania of its party-appointed arbitrator in due course. Under Article 7(2) of the UNCITRAL Arbitration Rules Lithuania shall notify the Fund of the appointment of its party-appointed arbitrator within thirty days after the receipt of the Fund's notification of the appointment of the arbitrator. Thereafter, the two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the Tribunal (Article 7(1) of the UNCITRAL Arbitration Rules).

68. For the purpose of the determinations to be made, in due course, pursuant to Articles 15 – 17 of the UNCITRAL Arbitration Rules, the Fund respectfully proposes that the:

1. the appointing authority, if so required, shall be the Secretary-General of the Permanent Court of Arbitration;

2. language of the arbitration be English; and

3. the place and legal seat of arbitration be Paris, France.

## VII. THE PARTIES TO THE DISPUTE

### A. Claimant

69. The Fund is a Russian investment fund with its registered address at:

   Kashtanovaya Alley, 143И

   Office 7

   Kaliningrad

   Russia

70. The following shall serve as counsel for Claimant:

| | |
|---|---|
| Alexander Yanos | Dmitry Dyakin |
| Carlos Ramos-Mrosovsky | Vladimir Pestrikov |
| Rajat Rana | Vsevolod Taraskin |
| **ALSTON & BIRD LLP** | Veronika Burachevskaya |
| 90 Park Avenue | Olga Kuprenkova |
| New York, NY 10016 | Veronika Lakhno |
| Tel: 202-210-9400 | **Egorov Puginsky Afanasiev & Partners** |
| Fax: 212-210-9444 | 21, 1st Tverskaya-Yamskaya Str. |
| alex.yanos@alston.com | 125047, Moscow, Russia |
| carlos.ramos-mrosovsky@alston.com | Tel: +7(495) 935 80 10 |
| rajat.rana@alston.com | Fax: +7 (495) 935 80 11 |
| | dmitry_dyakin@epam.ru |
| | vladimir_pestrikov@epam.ru |
| | vsevolod_taraskin@epam.ru |

>   veronika_burachevskaya@epam.ru
>
>   olga_kuprenkova@epam.ru
>
>   veronika_lakhno@epam.ru

71. For purposes of these proceedings, Claimant's address of record shall be deemed to be those of its counsel of record and all communications shall be served on it through counsel.

B.  **Respondent**

72. Lithuania is a sovereign State which is a Party to the Treaty.

73. The Ministry of Finance of the Republic of Lithuania was appointed and authorized to represent the Republic of Lithuania in this dispute according to the Decree of the Government of Lithuania No. 698 of 13 June 2012. Absent any information on appointment of any other representative, we consider the Ministry of Finance the principal point of contact with Lithuania:

>   Vilius Šapoka
>
>   Minister of Finance
>
>   **Ministry of Finance of the Republic of Lithuania**
>
>   Lukiškių Str. 2
>
>   01512 Vilnius
>
>   Lithuania
>   Tel: +370 5 239 0005
>
>   Fax: +370 5 212 6387
>
>   Vilius.Šapoka@finmin.lt

**VIII.  RELIEF REQUESTED**

74. On the basis of the foregoing, without limitation and reserving the Fund's right to supplement these prayers for relief, the Fund respectfully requests that the Tribunal:

    a) DECLARE that Lithuania has breached Articles 2(2), 3(1). 3(2) and 6 of the Treaty;

b) ORDER Lithuania to provide the Fund full reparation for all loss and damages inflicted by Lithuania's breached of the Treaty and international law, plus interest until the date of payment;

c) AWARD such other relief as the Tribunal considers appropriate; and

d) ORDER Lithuania to pay all of the costs and expenses of this arbitration, including the Fund's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal and other costs and fees.

Respectfully submitted on 29 April 2019

Egorov Puginsky Afanasiev & Partners

_____

ALSTON & BIRD LLP

_____