## NOTICE OF AN INVESTMENT DISPUTE PURSUANT TO ARTICLE 10 OF THE TREATY BETWEEN THE GOVERNMENT OF THE RUSSIAN FEDERATION AND THE GOVERNMENT OF THE REPUBLIC OF LITHUAINA CONCERNING THE ENCOURAGEMENT AND RECIPROCAL PROTECTION OF INVESTMENT

Mr. Vladimir Antonov

Investor

v.

The Republic of Lithuania

Party

Served on the Republic of Lithuania: c/o
To:

Ms. Dalia Grybauskaitė
President of the Republic of Lithuania
Office of the President of the Republic of Lithuania
S. Daukanto a. 3, LT 01122 Vilnius,
Tel. +370 5 2664154,
Fax +370 5 2664145,
E-mail: kanceliarija@president.lt
Registration code 188609016

Mr. Andrius Kubilius
Prime Minister of the Republic of Lithuania
Government of the Republic of Lithuania
Gedimino Ave. 11, LT-01103 Vilnius,
Tel. +370 5 2663711,
Fax +370 5 2663895,
E-mail MPtarnyba@lrv.lt
Registration code 188604574

Mr. Remigijus Šimašius
Minister of Justice of the Republic of Lithuania
Ministry of Justice of the Republic of Lithuania
Gedimino Ave. 30, LT-01104 Vilnius,
Tel. +370 5 266 29 81,
Fax +370 5 262 59 40,
E-mail: rastine@tm.lt
Registration code: 188604955

Mr. Audronius Ažubalis
Minister of Foreign Affairs of the Republic of Lithuania
Ministry of Foreign Affairs of the Republic of Lithuania
J. Tumo-Vaižganto str. 2, LT-01511 Vilnius,
Tel. +370 5 236 24 44
Fax +370 5 231 30 90,
E-mail: urm@urm.lt
Registration code: 188613242

Ms. Ingrida Šimonytė
Minister of Finance of the Republic of Lithuania
Ministry of Finance of the Republic of Lithuania
Lukiškių 2, LT-01512 Vilnius,
Tel. + 370 5 239 0000,
Fax + 370 5 279 1481,
E-mail: finmin@finmin.lt
Registration code: 288601650

Mr. Vitas Vasiliauskas
Chairman of the Board of the Central Bank of the Republic of Lithuania
Central Bank of the Republic of Lithuania
Gedimino Ave. 6, LT-01103 Vilnius,
Tel: +370 5 268 0029,
Fax: +370 5 262 8124,
E-mail: info@lb.lt
Registration code: 188607684

Filed by:
Sayenko Kharenko LLC
10 Muzeyny Provulok
Kyiv 01001, Ukraine
Tel.: +380 44 499 6000
Fax: +380 44 499 6250
E-mail: info@sk.ua

[●] April 2012

1.

1. Mr Vladimir Antonov (the "**Investor**") is a well-known European banker and businessman who, as one of the Convers Group owners, directly and indirectly owned and continiues to own several very substantial businesses in the Baltic states such as Latvia's national airline Air Baltic, the largest Latvian railway company RVR, a Latvian media holding telegraph LV which owns newspapers and radio stations in Latvia, the "Lietuvos Rytas", a Lithuanian media group comprising of a publishing house, an internet portal, a TV station and Lithuania's largest newspaper ("**Lietuvos Rytas**") by circulation.

2. Within the meaning of Article 1a of the Treaty between the Government of the Republic of Lithuania and the Government of the Russian Federation concerning the encouragement and reciprocal protection of investment dated 29 June 1999 (the "**BIT**"), '*investor*' means any

individual being a citizen either of the Russian Federation or of the Republic of Lithuania and eligible to invest in the territory of other contracting party pursuant to the legislation of such party. The Investor as a citizen of the Russian Federation and as an individual investing in the Republic of Lithuania is an investor under the BIT. According to Article 2 of the BIT 'investment' means any types of assets invested by an investor of one contracting party in the territory of the other contracting party pursuant to the legislation of such party and includes, *inter alia*, but not limited to:
   a. movable and immovable property and related interests;
   b. shares, contributions, bonds and other forms of participation in enterprises and companies; and
   c. any other assets.

3. This means that all shares of AB Snoras Bank ("**Snoras**") owned by the Investor shall be considered investments under the BIT.

## 2.

1. In 2004 on the request of the Bank of Lithuania the Investor acquired 68.1 per cent of the issued and fully paid up ordinary shares in Snoras from Convers Group which held a controlling stake in Snoras since 2003. At the time of the acquisition by the Investor, Snoras being one of the oldest banks in the country was ranked 7th in Lithuania by capital and 6th by assets. The then Chairman of the Management Board and President of Snoras, Mr. Raimondas Baranauskas acquired 25.31 per cent of Snoras, leaving 6.59 per cent of the issued and fully paid up share capital in the free float on the Lithuanian Stock Exchange. The Investor and Mr. Raimondas Baranauskas had intended to grow Snoras into a substantial European bank and the principal financing vehicle for the Convers Group. Shortly after completion of the acquisition, Snoras moved its headquaters to Vilnius and obtained a permission to set up its retail chain.

2. Together with Mr. Raimondas Baranauskas the Investor has embarked on the exercise of growing Snoras and developing new, often innovative and unique to Convers Group products. By 2011 Snoras banking group was comprised of Snoras, Latvijas Krajbanka (the oldest bank in Latvia), and nine other subsidiary companies: UAB "SNORAS leasing", UAB "SNORAS Investment Management", AB "Finasta Holding", UAB "SNORAS Media", UAB "SNORAS Development", UAB "SNORO valda", OU "Real Estate Investment Management" and UAB "Dieveris". Snoras lead group companies provided funding, leasing services, asset management, corporate and retail banking services, real estate management, construction and renovation services, custody, brokerage and settlement services for Lithuanian and Baltic countries' market participants. Snoras in 2011 became fifth bank in Lithuania size-wise along with such banks as Swedbank, SEB bank, DNB bank, and Nordea bank Finland, with over 2350 employees, who provided services to more than 1, 2 million clients. Snoras had the largest and the most modern retail network in the Republic of Lithuania: 257 banking outlets, 12 regional branches existing in each Lithuanian district, Estonia and Latvia, 15 branches and 230 saving units functioning across the country. Snoras operated 339 cash machines, had representative offices in the United Kingdom, the Kingdom of Belgium, Czech Republic, Ukraine, the Republic of Belarus and was the holder of the entire issued and paid up share capital in "Pointon York Limited", a credit institution based and authorized to conduct investment business in the United Kingdom. Snoras had an unlimited banking licence No.8 which allowed Snoras to engage in any type of banking business in Lithuania.

3. The assets of Snoras (excluding Snoras group) between 2003 and 2011 grew from c. US$400 million (980 million Litas) in assets to c. US$3,3 billion (8,09 billion Litas) with deposits

reaching a record US$2,5 billion (6,13 billion Litas). To ensure such rapid growth the Investor and Convers Group provided shareholder loans and additional equity on a regular basis. In 2005 the Investor has provided Snoras with a €20 million subordinated loan, in 2009 he subscribed to another subordinated loan of €7,5 million. In addition to these financings the Investor in 2009 subscribed to the indefinite term bonds of 10,5 million aggregate nominal value.

4. In 2011 the Investor has successfully negotiated an equity investment of US$155 million (380 million Litas) into Snoras by an alternative investment fund "JFP Emerging Europe Momentum Fund". If the Bank of Lithuania were to allow registration of the new share issue, the issued and fully paid up capital of Snoras would have increased by 1,8 times – from 494,2 million Litas to 874,3 million Litas. The demand for the new shares twice exceeded the supply. The investors' interest in new Snoras shares showed that Snoras business was positively valued by investor community. If the 2011 share issue would not have been blocked by the Bank of Lithuania, Snoras would have become the third largest bank in the country by capital.

5. Fitch, a leading international ratings agency, independently rated Snoras as of 1 April 2011, as follows: Long-term B+; Short-term B; Individual 0/E; Support 4; Rating outlook stable. In summary, Snoras was solvent with no liquidity problems at all material times in the lead up to intervention by the Bank of Lithuania.

6. Following the acquisition of 68.1 per cent of ordinary issued shares in Snoras the Investor legitimately and reasonably worked to develop this enterprise and to profit as a shareholder and as a creditor. Since the Investor's acquisition of the shares the Republic of Lithuania assumed a duty to protect the Investor's title to and rights in the ordinary shares acquired by the Investor under international obligations binding the Republic of Lithuania and national laws and regulations, such as Article 23 of the Constitution of the Republic of Lithuania.

3.

1. Until 2008 the Social Democratic Party (the "**SDP**") was in power in Lithuania and both the Investor and Mr. Raimondas Baranauskas were close to the SDP leader, Mr. Algirdas Mykolas Brazauskas.

2. In 2008, the Conservative Party came to power, exhibiting much greater anti-Russian rhetoric than had been evident under the SDP.

3. In 2009, Snoras, through its wholly owned subsidiary Snoras Media, acquired a 34 per cent stake in Lietuvos Rytas. As well as a 34 per cent shareholding in Lietuvos Rytas, Snoras Media acquired Lietuvos Rytas's debt and thus had effective operational control over it with editorial control remaining with the Chief Editor. Lietuvos Rytas has the largest circulation in the country and as a result has the potential to wield great political influence. It has always been strongly critical of the Conservative government and of the President Ms. Dalia Grybauskaite who, whilst ostensibly a member of the Independent Party, was elected with the strong support of the ruling Conservative Party on 12 July 2009.

4. From around 2009 onwards, Snoras was subjected to disproportionate, discriminatory and financially damaging intervention by the state, led by the Bank of Lithuania.

5. In January 2011, the Bank of Lithuania prohibited Snoras from making loans to foreign nationals and non-residents in general, and Russian companies and individuals in particular. The prohibition extended to existing loans, with Snoras being forced to reduce loans to Russian nationals to below 50 per cent of its total capital. No other banks in Lithuania were

put under so much pressure. In particular, no other banks were compelled to reduce and recall loans to foreigners. When the management of Snoras asked the Bank of Lithuania why they were imposing such severe restrictions and setting impossible targets for Snoras, the former responded that it was not their decision. They said that the decision came from the top and was made by the President of the Republic of Lithuania.

6. In April 2011 Mr. Vitas Vasiliauskas, a close ally of the incumbent President Ms. Dalia Grybauskaite, was appointed the new governor of the Bank of Lithuania. Following his appointment the punitive restrictions on Snoras intensified, culminating in the seizure of Snoras, its nationalization and commencement of insolvency.

7. The Investor and Mr. Raimondas Baranauskas were repeatedly warned about likely consequences to their business caused by Lietuvos Rytas criticism of the incumbent President, Ms. Dalia Grybauskaite.

8. On 19 July 2011, a meeting was held at the Bank of Lithuania. The board of the Bank of Lithuania attended in full together with the Investor and Mr. Raimondas Baranauskas. Snoras's financial position was discussed but the governor of the Bank of Lithuania appeared more interested in discussing the ownership of Lietuvos Rytas.

9. On Friday 11 November 2011, Snoras was granted a two-month extension to finalise a previously-agreed plan, sanctioned by the Bank of Lithuania, for the sale of approximately 30 per cent of the Snoras's shares to a group of three UK investors. This followed an earlier agreed capital injection of US $30 million by the Investor. On the same date the Bank of Lithuania sent Snoras a formal invitation to a meeting to be held on 18 November 2011 to discuss its approval of this capital injection. However, it is now apparent that on 9 November 2011, prior to the grant of this extension and the setting up of this meeting, the Bank of Lithuania had already asked the Prosecutor General's Office to commence an investigation into Snoras.

10. On 14 November 2011 the Prosecutor General's Office of the Republic of Lithuania initiated a pre trial investigation into allegations of embezzlement of property of substantial value belonging to Snoras, money laudering, fraudulent accounting and other activitities defined by the Criminal Code of the Republic of Lithuania as serious offences in particular, the allegedly fraudulent transfer of 897 million Litas (US$366 million) to Swiss bank accounts in the name of the Investor.

On 16 November 2011, by Resolution of the Board of the Bank of Lithuania, restriction on activities of Snoras was imposed until 16 January 2012 and a temporary administrator was appointed. It is indicated in the conclusion of the Bank of Lithuania regarding the insolvency of Snoras that according to the balance-sheet statement of Snoras as of 16 November 2011, the net asset value of Snoras was lower than its liabilities. As of 16 November 2011, Snoras's net asset value was 4416,255 million Litas and Snoras's liabilities amounted to 7171,921 million Litas. Thus, it was alleged that the net asset value of Snoras is lower than Snoras's liabilities by the amount of 2755,666 Litas. Following suspension of the activities of Snoras which had no liquidity problems at that time, the Bank of Lithuania and the Government of the Republic of Lithuania passed the decision to liquidate the bank *de facto*, without even waiting for the conclusions of the temporary administrator on solvency of Snoras. The Government of Lithuania made public its intentions to split Snoras assets into two groups. As such split is impossible without closing Snoras, it was decided on the same day to nationalise 100% of ordinary shares in Snoras and place Snoras into temporary administration.

12. In the immediate aftermath of the seizure several officials issued contradicting statements about the true solvency position of Snoras, with some claiming that Snoras was solvent.

13. Thus, by seizing Snoras the Government of Lithuania of Snoras ignored the results of the Bank's of Lithuania several inspections of Snoras, the last of which was completed on 16 November 2011. There was no public need to nationalise Snoras and no fair compensation was offered or paid to Snoras shareholders in breach of Art.23 of the Constitution of the Republic of Lithuania, Art. 5 of the Law of the Republic of Lithuania "On compensation for the damage caused by unlawful actions of the authorities" and Constitutional Court rulings as of 27 May 1994, 22 December 1995 and 18 June 1998. Furthermore, Snoras group was actively financing other parts of Convers Group and the unlawful seizure of Snoras from its rightful and diligent owners resulted in a very substantial loss and damage to other parts of Convers Group, such as Saab Cars AB, Convers Sports Initiatives, Spyker Cars AB, Air Baltic, Latvijas Krajbanka, and others. The Investor estimates the quantum of this loss and damage other parts of Convers Group to be c. US$2,4 billion (6 billion Litas) in addition to the loss and damage caused to him by unlawful seizure of his shares in Snoras, the value of which was on the 16 November 2011 7,756,671,040 Litas (c. US$3,17 billion). Furthermore, actions of the Lithuanian Government and, particularly, criminal prosecution of the Investor on unsubstantiated charges and issue of a European Arrest Warrant for him, precluded the Investor from taking steps to mitigate the loss and damage to him personally and Convers Group of which he is the Chief Executive Offiver.

4.

1. According to **part 2 of Article 2** ('Promotion and protection of investments') of the BIT each contracting party guarantees the investors from the other contracting party full protection and safety for their investments. It follows from this provision that the Investor's shares in Snoras should have been protected by the Government of Lithuania against any hostile actions, including illegal seizures and nationalisation without proper compensation.

2. In accordance with **Article 6** ('Expropriation and compensation') of the BIT investments shall not be subject to expropriation, nationalization or other actions of this nature except for when such actions are taken in public interests according to the law without discrimination and supported by payment of prompt, adequate and effective compensation. The compensation shall correspond with the market value of expropriated investments directly before the moment when the information on actual or planned expropriation of such investments becomes known to the public. The compensation shall be paid without unreasonable delay in freely convertible currency and shall be freely transferred from one county to the other. Before the payment date the amount of the compensation shall be added with interest calculated with reference to LIBOR interest rate.

3. In breach of **Article 2** the Lithuanian Government was actively engaged in various actions which resulted in the unlawful seizure of Snoras from its shareholders on the direct order of the Bank of Lithuania which is an emanation of the Republic of Lithuania. The Republic of Lithuania has failed to demonstrate the public need for nationalisation and subsequent bankruptcy of Snoras, thus breaching not only its domestic legislation in force at the time of the seizure, but also the relevant provisions of the BIT, its own international obligations and basic principles of international law.

4. In breach of **Article 6** of the BIT the Lithuanian Government at no time prior to or following the completion of the unlawful seizure of Snoras from its shareholders has made any offers of, entered into negotiations about or made any approaches to the Investor in relation to payment to him of the adequate and effective compensation.

5. This letter constitutes notice to the Republic of Lithuania of an investment dispute within the meaning of **part 1 of Article 10** of the BIT. The Investor invites the Republic of Lithuania to

resolve the investment dispute amicably within six (6) months from the date of this letter. If the amicable resolution cannot be reached within six (6) months, the Investor reserves his right to commence binding arbitration under **part 2 of Article 10** of the BIT and the Investor will submit a Request for Arbitration to the International Chamber of Commerce in Paris, France.

For and on behalf of Mr. Vladimir Antonov

_____

Mr. Andrei Liakhov Ph.D.
Partner

Sayenko Kharenko LLC
10 Muzeyny Provulok
Kyiv 01001, Ukraine
Tel.: +380 44 499 6000
Fax: +380 44 499 6250
E-mail: ALiakhov@sk.ua

[●] April 2012